Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
Steven A. Haskins, State Bar. No. 238865
sah@mccunewright.com
Valerie L. Savran, State Bar No. 334190
vls@mccunewright.com
**MCCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Ph: (909) 557-1250 / Fax: (909) 557-1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Ph: (618) 307-6116 / Fax: (618) 307-6161

Hassan A. Zavareei (State Bar No. 181547)
hzavareei@tzlegal.com
**TYCKO & ZAVAREEI, LLP**
2000 Pennsylvania Avenue, Suite 1010
Washington, DC 20006
Ph: (202) 973-0900 / Fax: (202) 973-0950

Cristina M. Pierson, FL Bar No. 984345*
cmp@kulaw.com
**KELLEY UUSTAL, PLC**
500 N. Federal Hwy., Suite 200
Fort Lauderdale, FL 33301
Ph: (954) 522-6601 / Fax: (954) 522-6608

*_Pro Hac Vice_ application to be submitted

Attorneys for Plaintiffs and the Putative Class

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAPPY PUPPY LA, INC., BRANDAMIZE, LLC, and AURORA ENVIRONMENTAL SERVICES, INC., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, N.A., <br><br> Defendant. | Case No.   2:23-cv-1354 <br><br> **COMPLAINT FOR:** <br><br> 1. Breach of Contract <br> 2. Breach of the Implied Covenant of Good Faith and Fair Dealing <br> 3. Negligent Misrepresentation <br> 4. Fraudulent Misrepresentation <br> 5. Fraud in the Inducement <br> 6. Breach of Fiduciary Duty <br> 7. Violation of the California Unfair Competition Law (Bus. & Prof. Code § 17200. _et sea._) |

-1-

8.  Violation of California False Advertising Act (Bus. & Prof. Code § 17500)

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

Class Action Complaint
Case No.:

1
2
3
4

Plaintiffs Happy Puppy LA, Inc., Brandamize, LLC, and Aurora Environmental Services, Inc., ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, hereby present this Class Action Complaint against Defendant Bank of America, N.A. ("Defendant").

5

## INTRODUCTION

6
7
8
9
10
11

1. The COVID-19 pandemic caused economic upheaval unparalleled since the 1930s.[1] Responding to the unprecedented economic crisis and the financial stress resulting from it, the United States adopted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), on March 27, 2020. The CARES Act provided economic relief to millions of struggling Americans, including small business owners.[2] The program eventually authorized approximately $2 trillion worth of economic assistance.

12
13
14
15
16
17
18
19
20

2. Among its provisions, section 1102 of the CARES Act initially allocated $349 billion[3] to the Small Business Administration ("SBA") to provide forgivable loans to eligible small businesses.[4] So long as an eligible business used the loan primarily to cover "eligible payroll" costs, interest on mortgage obligations, rent under lease agreements, and utilities, up to a certain percentage (25 percent, and then later 40 percent) during the covered period, the loan would be forgiven if the business kept its workers employed through June 2020.[5] This program, fully backed by the SBA and in consultation

21
22
23
24
25
26
27
28

[1] *See, e.g.*, FACT CHECK: COVID-19 could be the worst economic crisis since the Great Depression | PolitiFact Missouri | columbiamissourian.com (last visited February 2, 2023).
[2] H.R. 748 – CARES Act, *available at* https://www.congress.gov/bill/116th-congress/house-bill/748/all-actions. (last visited February 1, 2023).
[3] Congress authorized an additional $310 billion in funding for the PPP program in April 2020. *See* Additional $370B in Coronavirus Funds Now Available – Total Tech Summit (last visited February 1, 2023).
[4] $349 Billion In Forgivable Paycheck Protection Loans For Nonprofits. Here's How To Apply. (forbes.com) (last visited February 1, 2023).
[5] *See id.*

with the Department of the Treasury, was called the Paycheck Protection Program ("PPP").[6]

3.     Congress authorized the PPP to provide "eight weeks of cash flow assistance to small businesses through federally guaranteed loans to employers who maintained their payroll. Such assistance was to cover costs such as payroll, paid sick leave, supply chain disruptions, and employee salaries. The PPP further provided that certain amounts owed on such loans were eligible to be forgiven."[7]

4.     The PPP rules provided that "eligible payroll costs," included, *inter alia*, "salary, wages, commissions, or tips (capped at $100,000 on an annualized basis for each employee)."[8] However, the amount of the eligible loan was limited to "up to two months of [the business's] average monthly payroll costs from the *last year* plus an additional 25% of that amount," subject to a "$10 million cap."[9] The PPP guidelines excluded the compensation paid to non-employee independent contractors (often called "1099 workers" because their payments are reported on IRS Form 1099-MISC as opposed to the IRS Form W-2 used for employees) in calculating PPP Loan amounts, because payments to independent contractors were not "eligible payroll costs."[10] But while small businesses utilizing 1099 workers were eligible for PPP forgiveness, they couldn't claim those workers as part of their payroll to increase the size of their loans.

---

[6] H.R. 748 – CARES Act, Summary, Division A, *available at* https://www.congress.gov/bill/116th-congress/house-bill/748. (last visited February 1, 2023).
[7] *Id.*
[8] PPP--Fact-Sheet.pdf (sba.gov) (last visited February 2, 2023).
[9] *Id.*
[10] PPP expressly established a separate PPP program for independent contractors, freelancer workers, and other so-called "Schedule C" workers. *See* Paycheck Protection Program Loans - How It Works (sba.com) (stating that "independent contractors and self-employed individuals can apply for and receive loans to cover their payroll and other certain expenses through U.S. Small Business Administration lenders.") (last visited February 13, 2020). Those individuals were supposed to submit their own requests for PPP aid rather than obtain such aid secondhand from their contractual partners.

5.     In order to process and disburse these loans to qualifying small businesses, the SBA partnered with numerous financial institutions nationwide, including Bank of America.

6.     Financial institutions participating in the PPP, like Bank of America, profited because the SBA paid processing fees in amounts based on the size of the loans they issued. Fees were awarded on a sliding scale, starting at 1% of loan amounts more than $2 million, then increasing in percentage as the loan amounts decreased, until the originating institution received 5% in fees for every loan issued up to $350,000.[11] Because banks received fees on this basis, the incentives for making PPP Loans were far different than is normally the case for loans. Participating banks did not have to concern themselves, as per usual, with whether a loan could be paid back because the loans were meant to be forgiven. Without concern for repayment, participating banks were incentivized to increase the amounts of each issued PPP Loan, which meant more profit. And consistent with its size, Bank of America was the second largest private originator of PPP Loans, originating approximately $35.4 billion in loans since April 2020.[12]

7.     To increase the number and amount of PPP Loans it originated, Bank of America marketed the program to small business owners in a deceptive and misleading way. For example, Bank of America knew, or should have known, that the SBA would only approve forgiveness of loans to business owners that used PPP Loans to pay retained employees, not 1099 employees. Nevertheless, Bank of America marketed PPP Loans as a way for small businesses to borrow money to pay independent contractors. To induce these potential applicants to originate their loans with Bank of America (as opposed to some other institution), Bank of America told them they could apply for loans based partially, or even fully, on past payments made to 1099 workers, and that as long as they utilized the PPP Loans to continue covering their payroll and other eligible expenses,

---

[11] PPP Lender Information Fact Sheet.pdf (treasury.gov) (last visited February 1, 2023).
[12] Small business: paving the road to recovery (bankofamerica.com) (last visited February 2, 2023).

Class Action Complaint
Case No.:

their loans would be forgiven. Bank of America's representations were false, as many small business owners have since discovered the hard way.

8.      Despite the duty to act in good faith in originating the loans, the bank turned a blind eye to payroll requirements and uniformly misled applicants regarding the applicability of payments to 1099 workers. Making matters worse, Bank of America compounded its deception by resorting to high-pressure sales strategies to convince small businesses, to inflate the amount of their PPP Loans, even in cases where 1099 workers were not on the payroll. For example, Bank of America refused to process loan applications from businesses that requested less than what Bank of America had purportedly determined was available for borrowing under the PPP, which Bank of America was calculating in amounts far higher than what the SBA formula allowed. Bank of America also threatened that if applicants failed to borrow the full amount purportedly available through Bank of America's calculations, the available PPP would be exhausted and prevent them from obtaining any assistance at all.

9.      By employing these strategies, Bank of America left small businesses little choice but to apply for the loan amounts Bank of America insisted upon. When owners became skeptical, Bank of America would inform applicants that it had its own formula for determining the maximum forgivable loan amount available under the PPP. It then instructed applicants to apply for the higher amount that Bank of America's "formula" calculated, promising applicants that these higher amounts would be forgiven. Thus, as Bank of America represented, small businesses could benefit from the additional money with no risk because the loans would ultimately be forgiven.

10.      Through its misleading marketing and business practices, Bank of America convinced thousands (and potentially millions) of desperate small-business owners trying to save their businesses from collapse in the midst of a global pandemic to obtain loan amounts far higher than would ever be forgiven, even though the only reason applicants were taking out these loans was because forgiveness was being offered. And what's worse, Bank of America now refuses to forgive these loans, even though Bank of America

encouraged applicants to assume these debts by promising they would be forgiven. Thus, Bank of America is the sole and proximate reason that Plaintiffs, and other applicants, have been saddled with large debts they are unable to repay.

11.     Furthermore, Bank of America is highly incentivized to shift blame for its own mistakes back to borrowers, who sought help from Bank of America in good faith and as a result have been saddled with thousands of dollars in unforgiven loans. A 2021 SBA directive stated that excess loan amounts caused "in whole or in part to the lender's failure to satisfy its obligations under PPP rules" would cause the bank to lose SBA guarantees of loan forgiveness. In other words, a bank misapplying the rules to increase its profits from fees did so at its own risk.

12.     Plaintiffs never would have applied for the amounts they applied for without Bank of America's promises and assurances that the resulting loans would be forgiven. And since Bank of America's errors have voided its own SBA guarantees, it would be singularly unfair for Bank of America to pass the damage it has caused along to unwary borrowers. This lawsuit is necessary to ensure that Bank of America takes responsibility without passing undue burdens to unwitting victims.

## JURISDICTION AND VENUE

13.     The Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. §§ 1332(d)(2)(A) and (d)(6), because the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, and it is a class action in which Plaintiffs and one or more of the other Class Members are citizens of a state different than that of the Defendant. Here, Plaintiffs are all citizens of California, and Bank of America is a citizen of Delaware and North Carolina. This Court also has supplemental jurisdiction over Plaintiffs' state-law claims, pursuant to 28 U.S.C. § 1367.

14.     Plaintiffs and Bank of America agreed to the personal jurisdiction of the state and federal courts in California in Section 9 of the Promissory Note governing their PPP Loan. Specifically, Section 9 states that the Promissory Note "shall be governed and interpreted according to the internal laws of the state of Borrower's principal place of

business (the "Governing Law State")…[and that the] Borrower and Bank agree and consent to be subject to the personal jurisdiction of any state or federal court located in the Governing Law State so that trial shall only be conducted by a court in that state." Here, all Plaintiffs' principal places of business are in California.

15.     This Court also has personal jurisdiction over Bank of America because it is authorized to do business and regularly conducts business throughout the United States, including in California.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Bank of America resides in the District since it is subject to this Court's personal jurisdiction with respect to this civil action. *See* 28 U.S.C. § 1391(c)(2). Venue is further proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within the District.

## **PARTIES**

17.     Happy Puppy LA, Inc. is an S Corporation operating as a dog boarding and training facility, located at 5510 Tyrone Ave, Sherman Oaks, CA 91401.

18.     Brandamize, LLC is an LLC operating as a sales and marketing firm, located at 801 Parkcenter Drive, Suite 120, Santa Ana, CA 92606.

19.     Aurora Environmental Services, Inc. is a licensed California Corporation located in San Francisco, California that provides environmental health and safety compliance services. It is a 100% Woman-Owned Small Business (WBE), Minority Owned Small Business (MBE), Local Business Enterprise (LBE), and Small Local Emerging Business (SLEB), as certified by the California Department of General Services, the California Public Utilities Commission, Suppliers Clearinghouse, the City and County of San Francisco Contract Monitoring Division, the Port of Oakland, and the City and County of Alameda.

20.     Defendant Bank of America, N.A. is a Delaware national banking association with an address of P.O. Box 15220, Wilmington, DE, 19886 and a principal place of business of 100 North Tryon Street, Charlotte, NC, 28255. Among other things,

Defendant is engaged in the business of providing banking services to consumers. Defendant operates banking centers and conducts business throughout California, including within this District.

## FACTUAL ALLEGATIONS

### A.   Plaintiffs Apply for PPP Loans through Bank of America to Save their Businesses

21.   On March 27, 2020, Congress passed the CARES Act to provide critical monetary relief to individuals and businesses struggling to stay afloat at the start of the COVID-19 pandemic.

22.   As part of this important legislation, the SBA initially made available $349 billion in funding for small businesses to "provide eight weeks of payroll and certain overhead to keep workers employed."[13] Once this funding was approved, eligible small business owners were able to "go to a participating SBA 7(a) lender, bank, or credit union, apply for a loan, and be approved on the same day."[14] The legislation authorized the SBA to "forgive the portion of the loan proceeds that are used to cover the first eight weeks of payroll costs, rent, utilities, and mortgage interest."[15]

23.   The SBA outlined certain criteria for PPP eligibility, requiring that applicants have "500 or fewer employees whose principal place of residence is in the United States; or [be] a business that operates in a certain industry and meet the applicable SBA employee-based size standards for that industry, and are a small business as defined in section 3 of the Small Business Act (15 U.S.C. 632), and subject to SBA's affiliation rules under 13 CFR 121.301(f) unless specifically waived in the Act; or a tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC), a tax-exempt veterans organization described in section 501(c)(19) of the IRC, Tribal

---

[13] With $349 Billion in Emergency Small Business Capital Cleared, SBA and Treasury Begin Unprecedented Public-Private Mobilization Effort to Distribute Funds (last visited February 5, 2023).
[14] Id.
[15] Id.

business concern described in section 31(b)(2)(C) of the Small Business Act, or any other business."[16] In addition, applicants needed to document that they had been in "operation on February 15, 2020 and either had employees for whom they paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC."[17] Once applicants met the criteria, they could receive loans in an amount up to 2.5 times their qualifying monthly payroll costs, with a two-year maturity period.[18]

24. The PPP qualifying criteria had two steps, which Bank of America took advantage of to its benefit. The first step was for applicants to qualify as "small businesses" by showing that it had either traditional employees or used independent contractors. But then in the second step, businesses were supposed to calculate their qualifying costs, which excluded payments made to independent contractors. These payments were to be excluded because "independent contractors have the ability to apply for a PPP loan on their own, **so they do not count for purposes of a borrower's PPP loan calculation.**"[19] (emphasis added).

25. But within days of the CARES Act's passage, Bank of America began advertising the PPP Loan program to small businesses with independent contractors. In doing so, Bank of America conflated the two-step eligibility process, representing to potential applicants that they could not only qualify for the program because they employed independent contractors, but also that they could obtain forgivable loans to pay those contractors. For those businesses without 1099 workers, Bank of America likewise promised them forgivable loans in amounts determined by internal Bank of America formulas, and not SBA's formula, all in an effort to increase the fees Bank of America would earn from originating these loans.

---

[16] PPP Interim Final Rule_0.pdf (sba.gov) (last visited February 5, 2023).
[17] *Id.*
[18] *Id.*
[19] *Id.*

Class Action Complaint
Case No.:

**B.**     **Defendant Misrepresented in its Disclosures and Loan Application Documents the Terms of PPP Loans to Include Expenses to 1099 Workers**

26.     Plaintiffs became aware of the PPP and were solicited by Bank of America to process their PPP applications. Initially, Bank of America instructed Plaintiffs to use the bank's online portal to submit PPP Loan applications, and each Plaintiff did so in or around April 2020.

27.     Once Bank of America received Plaintiffs' initial application, it sent emails instructing each Plaintiff to gather supporting documents. These documents included payroll, FTE, and non-payroll documentation for the applicable period. As part of the application, Bank of America instructed applicants to upload any "Form 1099-MISC for 2019, *for services rendered as an independent contractor*."[20] (emphasis added).

28.     These documents may have been necessary to support Plaintiffs' applications for PPP assistance, as they were the means of proving that they were small businesses. But Bank of America also required Plaintiffs to provide evidence of the "cash compensation paid to employees" in order to calculate their forgivable loan amount. Nowhere did Bank of America indicate that Plaintiffs should exclude independent contractors; in fact, Bank of America used language indicating that 1099 workers should be included when calculating loan amounts eligible for forgiveness.

29.     At this point in the process, Bank of America informed Plaintiffs that after they uploaded their documents, it would review their applications. If information was missing, Bank of America promised to notify Plaintiffs. Otherwise, Bank of America would *"confirm the information and submit it to the SBA for approval."*[21](emphasis added). Plaintiffs understood that Bank of America was acting as their agent to confirm their information was acceptable and consistent with SBA rules, before the information was submitted to the SBA.

---

[20] *See* Paycheck Program- Required Document Reference Sheet, attached hereto as Exhibit A.
[21] *Id.*

30.     Bank of America had a duty to act in Plaintiffs' best interests but it either knew, or should have known, that it was using the wrong rules. The misrepresentations in Bank of America's disclosures compounded the problem further. And as a result of Bank of America's errors, Plaintiffs and others ended up with loans the SBA refused to forgive.

31.     Once the documents were received and the loan approved, Plaintiffs were required to complete a Promissory Note with the bank prior to the loan's disbursement. Section 4(1)(ix) entitled "REPRESENTATIONS, WARRANTIES AND COVENANTS" required Plaintiffs to certify that each was "in operation on February 15, 2020 and had employees for whom Borrower paid salaries and payroll taxes *or paid independent contractors (as reported on Form(s) 1099-MISC.)*"[22] Further, section 4(1)(xiii) required Plaintiffs to each certify that they had "provided to Bank all documentation available to Borrower on a reasonable basis verifying the dollar amounts of average monthly payroll costs for the calendar year 2019, which documentation shall include, as applicable, copies of payroll processor records, payroll tax filings, *and/or Form 1099-MISC."* (emphasis added).[23]

32.     Bank of America also required each applicant to complete a "Paycheck Protection Program Application Addendum" ("Addendum").[24] The Addendum required applicants to certify certain eligibility qualifications, including that they were "in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes *or paid independent contractors, as reported on Form(s) 1099-MISC*" (emphasis added).[25] When added to Bank of America's stated policies and representations, these documents reinforced Plaintiffs' beliefs that their entire loan amounts would be forgiven.

---

[22] Bank of America Promissory Note, attached hereto as Exhibit B (emphasis added).
[23] *Id.*
[24] Paycheck Protection Program Application Addendum, attached hereto as Exhibit C.
[25] *Id.*

33.     Bank of America's actions damaged Plaintiffs. It repeatedly represented that so long as applicants were eligible for PPP Loans and that they used their loans primarily for payroll and other authorized expenses, their loans would be forgiven.

34.     Plaintiffs relied on Bank of America's representations while applying for PPP Loans, expecting Bank of America to comply with the SBA's rules and to disclose any deficiencies that may impact the SBA's willingness to forgive the loans in the future. Bank of America knew that the critical benefit offered by the PPP was loan forgiveness, and thus that Plaintiffs were seeking the loans because they expected the loans to be forgiven.

35.     Plaintiffs would not have applied for non-compliant loans had Bank of America instructed them properly; that is, if Bank of America had not represented that Plaintiffs' loans would be forgiven, even if the loan amount was based on compensation to 1099 workers.  And now, these businesses cannot afford to pay back the loans Bank of America told them would be forgiven.

## C.     Defendant Misrepresented the Amount of Funds Available to Small Businesses Under the PPP by Failing to Follow the SBA's Formula for Qualifying Loan Amounts

36.     Plaintiffs are typical of the small businesses Bank of America targeted for originating PPP Loans. Bank of America's usual practice was to contact potential PPP applicants and tell them they qualified for additional funding pursuant to some unstated Bank of America formula.  And it continued to use aggressive sales techniques to coerce applicants into consenting to higher loan amounts. For instance, Bank of America's policy was to push concerned applicants by suggesting that if they did not apply for the funding pursuant to Bank of America's supposed "formula," available relief would be exhausted and Plaintiffs would be unable to receive more in the future, if needed. It even threatened not to submit the applications if Plaintiffs did not apply for the loan amounts Bank of America insisted upon. Applicants like Plaintiffs often relented based on Bank of America's assurances of future forgiveness. As a result, Bank of America qualified

thousands (or even millions) of businesses for loan amounts above and beyond those the SBA was authorized to forgive. Meanwhile, there was no reason for Plaintiffs to mistrust Bank of America's representations.

37.     Upon applying for forgiveness, Plaintiffs have been subsequently informed that their loans were overfunded or should never have been funded to begin with, and thus could not be forgiven by the SBA.

38.     Plaintiffs would not have applied for these loans at all, or would have applied for a lesser amount, were it not for Bank of America's misrepresentations. And now, economic conditions prevent Plaintiffs from paying back the loans Bank of America assured would be forgiven.

**D.     Plaintiffs Each Materially Relied on Bank of America's Representations to their Detriment**

**1.  Brandamize, LLC**

39.     Brandamize, LLC was formed in May 2018 as a marketing and sales agency located in Santa Ana, California. Brandamize is a 50/50 partnership between Bruno Barbosa and Joseph Brinkman.

40.     In March 2020, at the start of the pandemic when businesses were facing mandatory closures due to the declaration of a public health emergency and the need to slow the spread of COVID-19, Brandamize began receiving solicitations from Bank of America to apply for a PPP Loan.

41.     At that time, Brandamize employed around ten independent contractors with all their income reported on IRS Form 1099. Therefore, while Brandamize was eligible for PPP Loan relief as a small business, loan funds could not be used to pay independent contractors and later be forgiven by the SBA.

42.     Had Brandamize been permitted to borrow only the amounts needed to cover rent and other non-labor expenses, Bank of America's fees for originating the loan would have decreased significantly. Therefore, Bank of America was incentivized to increase the amount of the loan so it could collect the resulting fees. It represented to Brandamize

that by switching its 1099 workers over to W-2 employees prior to applying, Brandamize could receive a larger loan and it would be forgiven so long as Brandamize otherwise qualified for relief and used the loan for payroll expenses.

43.     Brandamize followed Bank of America's directions and, shortly thereafter, utilized the bank's online portal to apply for a PPP Loan in the amount Bank of America had represented would be forgiven. Brandamize submitted its application and all required documentation. Brandamize was then approved for a PPP Loan in the amount of $106,374.79.

44.     Brandamize used the loan primarily to maintain payroll costs for its employees during the covered period, following the direction that if it used the loan as Bank of America had specified, the loan would be forgiven.

45.     In or around December 2021, Brandamize applied for loan forgiveness through Bank of America's online portal.

46.     However, in or around May 2022, Brandamize received an email stating that it would not receive loan forgiveness because it had obtained the loan by including 1099 contract worker expenses in its initial application.

47.     To date, Brandamize has been denied loan forgiveness for the entire loan amount.

48.     Brandamize only applied for the amount of funding that it did because Bank of America promised that if it switched its 1099 workers over to W-2 employees, the entirety of the loan could be forgiven. It would not have accepted the loan had it known that including payroll expenses to 1099 workers in the initial application would disqualify it from obtaining forgiveness. Moreover, Bank of America told Brandamize prior to completing its loan application that it *was interested in applying only for a loan eligible for forgiveness.*

49.     As a result of Bank of America's material misrepresentations and inaccurate and misleading disclosures, Brandamize has obtained debts it cannot repay. The only reason Brandamize did so was that Bank of America promised the debt would be

forgiven. Since Bank of America's error voided its SBA guarantee and made the loan unforgiveable by the federal government, it only makes sense that Bank of America should be held to its representations and should forgive the debt it forced Brandamize to take on rather than Brandamize having to repay it, with interest, to Bank of America.

### 2. Happy Puppy L.A., Inc.

50.    Happy Puppy L.A., Inc. was founded by Eric Wiese as a dog boarding and training business in Sherman Oaks, California.

51.    In or around January 1, 2020, Happy Puppy changed seven 1099 workers to W-2 employees per new laws passed in California governing employee classification.[26]

52.    In or around March 2020, Happy Puppy was impacted by Los Angeles County's public health order limiting gatherings and requiring the closure of all "non-essential" businesses.[27]

53.    In or around March of 2020, Happy Puppy began receiving solicitations from Bank of America to apply for a PPP Loan. Shortly thereafter, Happy Puppy utilized Bank of America's online portal to apply for a PPP Loan.

54.    As part of its loan application, Happy Puppy signed a Promissory Note certifying that "Borrower was in operation on February 15, 2020 and had employees for whom Borrower paid salaries and payroll taxes ***or paid independent contractors (as reported on Form(s) 1099-MISC.)***"[28] (emphasis added). Further, section 4(1)(xiii) required Happy Puppy to certify that, "Borrower has provided to Bank all documentation available to Borrower on a reasonable basis verifying the dollar amounts of average monthly payroll costs for the calendar year 2019, which documentation shall include, as applicable, copies of payroll processor records, payroll tax filings, ***and/or Form 1099-***

---

[26] The New California Labor Laws You Need to Know for January 1, 2020 - Advocacy - California Chamber of Commerce (calchamber.com) (last visited February 6, 2023).
[27] Los Angeles County issues 'safer-at-home' order (nypost.com) (last visited February 6, 2023).
[28] *See* FN 22, *supra.*

*MISC."* (emphasis added). These statements reinforced misinformation Bank of America employees previously had told Happy Puppy.

55.    Happy Puppy submitted its application and all required documentation, including the Promissory Note, the Application Addendum, and average monthly payroll costs for 2019 as reported on Form 1099-MISC, as required by Bank of America.

56.    Around the time that Happy Puppy was completing its application and readying it for submission, Bank of America informed it that it was eligible for a loan in the amount of $40,000.

57.    Happy Puppy responded that the amount presented seemed exorbitant and told Bank of America a lesser loan amount likely would be appropriate.

58.    Bank of America responded by stating that based on the documentation provided and the loan calculation formula, which supposedly ***included expenses paid to independent contractors (as reported on Form(s) 1099-MISC),*** $40,000 was the "correct" loan amount, and that it was a "take it or leave it offer" because funds would run out and no loan would be available at all.

59.    As such, desperate to save the business and thinking it was the only option, in or around April of 2020, Happy Puppy applied for the $40,000 PPP Loan, which was approved and disbursed.

60.    In or around February 2021, Happy Puppy applied for loan forgiveness through Bank of America's online portal.

61.    However, in or around March 2022, Happy Puppy received an email declaring it ineligible for loan forgiveness because it included 1099 worker expenses when calculating the requested loan amounts. Happy Puppy never would have sought loans in these amounts except that it was following Bank of America's directions that (1) Happy Puppy needed to apply for the loan amount Bank of America required, or it would refuse to apply on Happy Puppy's behalf and (2) the loan would be forgiven.

62.     Between March and November 2022, Happy Puppy appealed the forgiveness denial to the SBA pursuant to 13 C.F.R. § 134.1201(b). Its appeal was denied in or around November 2022.

63.     To date, Happy Puppy has been denied loan forgiveness for the entire loan amount.

64.     Happy Puppy only applied for its PPP Loan as a result of Bank of America's representations in its disclosures, advertisements, and communications. It would never have accepted the loan had it known that including 1099 payroll expenses in its initial submission would prevent later forgiveness.

65.     Further, Bank of America knowingly and intentionally inflated the loan amount in order to increase its own profit. By telling Plaintiff to include payroll expenses paid to 1099 workers and refusing to process a loan for a lower amount, Bank of America induced Happy Puppy to accept a larger loan amount, even though such amount was not eligible for forgiveness.

66.     As a result of Bank of America's material misrepresentations and inaccurate and misleading disclosures, Happy Puppy now faces enormous debt it never wanted and cannot repay because Bank of America now refuses to forgive the loan.

### 3.  Aurora Environmental Services, Inc.

67.     Aurora Environmental Services was founded by Mabel Delgado in 2012. Aurora is a small environmental health and safety compliance services firm located in San Francisco, California. At the time the PPP was launched, Aurora employed nine full time employees.

68.     On or about April 7, 2020, Aurora applied through Bank of America for a $115,670 loan under the PPP. Aurora based the loan amount on what it believed to be the SBA formula for PPP loans. Aurora submitted its application and uploaded its verifiable payroll documentation to Bank of America's PPP portal for review and submission to the SBA.

Class Action Complaint
Case No.:

69.     On or about May 4, 2020, Bank of America deposited $115,053 in PPP funds to Aurora's account, which was $617 less than the amount Aurora requested in its application.

70.     Shortly thereafter, on or about May 18, 2020, Plaintiff received a call from a Bank of America representative who explained that Aurora actually qualified for an additional $291,210 in PPP funding. When Plaintiff inquired as to how that was possible, the representative stated it was based on Aurora's corporate tax returns and a "formula" used by Bank of America. Plaintiff merely needed to sign an amended application and Promissory Note reflecting the updated amount and Bank of America would submit it to SBA. When Plaintiff hesitated, the representative stated that "things were changing rapidly" and Aurora did not want to risk the funds being exhausted if it later realized it needed more. Plus, "what [did it] have to lose" given forgiveness was available?

71.     Accordingly, Plaintiff digitally signed an amended application prepared by Bank of America's representative to borrow additional money, and also digitally signed an amended Promissory Note with Bank of America for a PPP Loan in the amount of $406,263.

72.     On or about May 28, 2020, Plaintiff received a second account deposit in the amount of $291,210, for a total of $406,263.

73.     Plaintiff used the funds for only those purposes permitted under the PPP.

74.     On May 27, 2021, Plaintiff received a notice from Bank of America regarding an "important update on the amount of PPP loan forgiveness you are eligible to receive based on the SBA guidance." The notice informed Plaintiff that its PPP "loan ha[d] been overfunded." Given that Plaintiff's monthly payroll costs were $46,268, Plaintiff was only entitled to receive $115,670 using SBA's formula but Plaintiff had "requested a PPP loan in the amount of $406,263." Thus, Plaintiff would need to repay a minimum unforgiven amount of $290,593 under the terms of the signed Promissory Note.

Class Action Complaint
Case No.:

75.    Notably, Plaintiff had initially requested the correct loan amount. It was Bank of America that represented to Plaintiff that it qualified for the additional funds under the PPP, and that such funding would be forgiven.

76.    Plaintiff immediately began making numerous calls to Bank of America requesting that it recalculate the correct forgiveness in the full loan amount of $406,253. After numerous calls to Bank of America with wait times often over an hour and no resolution, and with the deadline to apply for forgiveness fast approaching, Plaintiff reluctantly applied for partial forgiveness ($115,670). Plaintiff only did this because Bank of America informed Aurora that if it tried to apply for more than the correct amount, it would not be allowed to access the PPP portal to complete the forgiveness application.

77.    Plaintiff's request for forgiveness of what was allegedly the proper amount was initially denied.  Accordingly, on April 22, 2022, Bank of America sent Plaintiff a letter indicating a repayment schedule for a principal loan balance of $406,263, plus 1% interest.  An appeal for forgiveness was denied, but after almost two years of advocacy, $115,670 was ultimately forgiven. However, Plaintiff must still repay the remainder of the total loan amount, which amounts to approximately $10,000 in monthly payments – money that Plaintiff does not have as it recovers from its losses caused by the pandemic. Notably, prior to taking out this loan, Plaintiff was 100% self-funded.  Now it carries debt that it would not have taken on if it had known the loans were not going to be forgiven.

78.    Plaintiff only applied for the $406,263 PPP Loan because of Bank of America's representations. It would never have accepted that amount had it known it would include sums that Bank of America would later refuse to forgive.

79.    Bank of America knowingly and intentionally inflated the loan amount in order to increase its own profit. By telling Plaintiff it qualified for the additional loan funding, Bank of America induced Plaintiff to accept a larger loan amount than it qualified for and for which Bank of America knew or should have known would not qualify for forgiveness.

80.     As a result of Bank of America's material misrepresentations, Plaintiff now faces enormous debt it never wanted and that it cannot repay because Bank of America refuses to forgive the entirety of the loan.

## CLASS ACTION ALLEGATIONS

81.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

82.     Pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2), and (b)(3), as applicable, Plaintiffs initially seek certification of the following classes (the "Class"):

**The 1099 Payroll Class**

All California entities that received a loan from Bank of America under the PPP and were denied loan forgiveness, in whole or in part, because they included payments to 1099 workers in the calculation of qualified payroll costs as part of the loan application and/or made payments to 1099 workers with loan proceeds.

**The Overfunding Class**:

All California entities that received a loan from Bank of America in excess of the amount permitted under the SBA's loan calculation formula adopted for purposes of administering the PPP, and whom were denied loan forgiveness, in whole or in part.

83.     Plaintiffs Brandamize, LLC and Happy Puppy L.A., Inc. represent, and are members of both the 1099 Payroll Class and the Overfunding Class.

84.     Plaintiff Aurora Environmental Services, Inc. represents and is a member of the Overfunding Class.

85.     Excluded from the Class are Defendant, any entity in which a Defendant has a controlling interest, and Defendant's employees, officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and

members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered.

86.    Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or division after having an opportunity to conduct discovery.

87.    The Class meets the criteria for certification under Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2), and (b)(3).

88.    Plaintiffs and all members of the Class have been harmed by the acts of Defendant. Class-wide adjudication of Plaintiffs' claims is appropriate because they can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

89.    **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed Class Members include at least hundreds of businesses located across California, there is significant risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant. Upon information and belief, the Promissory Notes and marketing material made available to Class Members were identical to those that Plaintiffs reviewed before applying for the PPP Loan. Defendant's acts and omissions thus caused damages in all of these cases, and inconsistent adjudications would be inefficient and wrongful.

90.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of Class Members is unknown to Plaintiffs at this time, it is believed that the Class is comprised of at least thousands,  if not millions, of members geographically dispersed throughout California. The exact number can be readily determined from the internal business records of Defendant, and Class Members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, Internet notice, and/or published notice.

91.     **Commonality and Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with Rule 23(b)(3)'s predominance requirement, this action involves common questions of law and fact as to all members of the Class that predominate over any questions affecting individual Class Members. The common questions include:

a.      Whether Defendant approved applications for loans under the PPP for amounts in excess of that provided by the SBA formula;

b.      Whether Defendant breached its contracts with Plaintiffs and the other Class Members by representing that their reported independent contractor expenses qualified, in whole or in part, for forgiveness;

c.      Whether Defendant breached the implied covenant of good faith and fair dealing by, *inter alia,* representing to Plaintiffs and the other Class Members their loans were eligible for forgiveness, and by failing to confirm the accuracy of the documentation Plaintiffs provided as required under the SBA guidelines;

d.      Whether Defendant engaged in an unfair business practice by overfunding loans in an effort to increase loan amounts and thus its own profit;

e.      Whether those common representations give rise to claims of misrepresentation and/or fraud; and

f.      Whether Plaintiffs and members of the Class are entitled to damages, costs, or attorneys' fees from Defendants.

92.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of other Class Members' claims, because they and Class Members were subjected to the same unlawful conduct and damaged in the same manner. Plaintiffs, like all members of the Class, took out a PPP Loan from Defendant after Defendant misrepresented their eligibility for loan forgiveness through the same documents, disclosures, and advertising

materials. Plaintiffs and all members of the Class, have been damaged in the same way because they carry huge debts due to their forgiveness applications being denied.

93. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because they were similarly harmed and affected by Defendant's practices, are members of the Class and are committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class, and their interests are wholly aligned, and are not antagonistic to, the interests of the members of the Class that they seek to represent. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in litigating consumer claims.

94. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and Class Members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. Plaintiffs are not aware of any other currently pending litigations in California representing California businesses only against Defendant to which any Class Member is a party involving the subject matter of this suit, and this suit presents no difficulties that will impede its management by the Court as a class action.

Class Action Complaint
Case No.:

95.     **Injunctive/Declaratory Relief. Fed. R. Civ. P. 23(b)(2).**  Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole under Rule 23(b)(2).  If injunctive relief is not ordered, Bank of America will continue to collect payments on PPP Loans that it promised would be forgiven.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (On Behalf of the 1099 Payroll Class)

96.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

97.     Plaintiffs and Class Members entered into a Promissory Note with Bank of America covering the terms and conditions of loans made pursuant to the CARES Act and the PPP. This contract was drafted by and binds Bank of America.

98.     By the Promissory Note's own terms, payments reported on IRS 1099-MISC forms were qualifying expenses to be included in the loan calculation formula, and as long as at least a specified portion of the loan proceeds were used to pay qualifying payroll costs as defined in the Promissory Note, the loans were promised to be forgiven. Specifically, the Promissory Note defines "average monthly payroll costs" to include "copies of payroll processor records, payroll tax filings and/or Form 1099-MISC."

99.     The Promissory Note further stated that "loan forgiveness will be provided by the SBA for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and utilities, and not more than 25% of the Forgivable Amount may be for non-payroll costs." On June 5, 2020, the SBA increased the portion of the loan proceeds that could be used for non-payroll costs and still qualify for forgiveness to 40%.

100.    In exchange for the loans received, Plaintiffs and Class Members agreed to provisions set forth in Sections 1 through 14 of the Promissory Note. Because Bank of America expressly promised loan forgiveness under the conditions stated, all parties

understood that the loans would be forgiven so long as Plaintiffs used them primarily to make payroll expenses, which they did.

101.   Plaintiffs and all Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Promissory Note, including using the loan proceeds as specified pursuant to the Promissory Note, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct,

102.   As defined and represented in the Promissory Note, the full loan amount was subject to forgiveness for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, assuming not more than 25% (later changed to 40%) of the Forgivable Amount was used for non-payroll costs.

103.   However, when Plaintiffs and Class Members sought forgiveness, Bank of America refused to facilitate their applications and told them that despite the bank's prior representations and agreement, the loans could not be forgiven because Plaintiffs had included 1099 workers in their loan amount calculation, and/or had used loan proceeds to pay 1099 workers.

104.   Bank of America has breached the Promissory Note in that it represented in the Note that the loans would be forgiven on the basis of either having 1099-MISC independent contractors on the payroll, or because those loans were used to cover independent contractors on the payroll. However, when Plaintiffs and Class Members applied for forgiveness, Bank of America denied such forgiveness because Plaintiffs had been induced to include their independent contractors when calculating their loan eligibility.

105.   Bank of America also breached the Promissory Note because it explained that loan forgiveness would be offered for "documented payroll costs," the contract definition of which included independent contractor expenses reported on IRS Form 1099-MISC. Plaintiffs and Class Members then used the loan money received to pay their documented payroll costs. Nevertheless, Bank of America now seeks repayment of the

loans used for documented payroll costs, including principal and interest, that it previously represented to Plaintiffs and Class Members were fully forgivable.

106.   Bank of America's guarantees as described in the Promissory Note were material terms.  The conditions for loan forgiveness were an integral and material element of the transaction between Plaintiffs and Bank of America, as the reasonable expectation of all borrowers was that they would be eligible for loan forgiveness at the end of the PPP process.

107.   As a direct and proximate cause of Bank of America's material breach, Plaintiffs and Class Members have been damaged and will continue to incur damage. Accordingly, they are entitled to compensation from Bank of America in the amount of their loans for which Bank of America has denied forgiveness, along with any interest Bank of America has charged and collected on these loans to date.

108.   Had Plaintiffs and Class Members known that payments to 1099 workers did not qualify under the SBA formula for PPP Loans and would not qualify for forgiveness under the PPP, they would not have applied for and taken a loan, would have reduced the amount they applied for under the program.

109.   As a proximate result of Bank of America's breaches, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (On Behalf of the 1099 Payroll Class)

110.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

111.   Plaintiffs and each of the Class Members entered into a Promissory Note with Bank of America. The Promissory Note was drafted by and binds Bank of America.

112.   Good faith is an element of every contract. Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing. Good

faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

113.    The material terms of the Promissory Note therefore included the implied covenant of good faith and fair dealing, whereby Bank of America covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiffs and each Class Member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' and the Class Members' rights and benefits under the contracts.

114.    Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Bank of America's misconduct.

115.    Bank of America has breached the implied covenant of good faith and fair dealing in the Promissory Note by (a) failing to comply with its obligations under the CARES Act and its affirmative representations to Plaintiffs and Class Members that it would confirm and verify the eligible loan amount using the documents submitted by Plaintiffs and Class members; (b) falsely and misleadingly representing to Plaintiffs and Class Members that certain payments as reported on Forms 1099-MISC were forgivable qualified payroll costs when they were not; and (c) refusing to submit forgiveness applications through the SBA portal on behalf of Plaintiffs and Class Members.

116.    Had Plaintiffs and Class Members known that payments to 1099 workers did not qualify for PPP Loans and/or would not qualify for forgiveness under the PPP, they would not have applied and taken a loan, would have reduced the amount of the loan they applied for, and/or would have allocated their loan funds differently.

117. As a proximate result of Bank of America's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION

### Negligent Misrepresentation
### (On Behalf of All Classes)

118. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth herein.

119. The SBA utilized financial institutions, like Bank of America, to process applications and approvals for PPP Loans not only from an administrative standpoint, but because of their superior knowledge on lending and loan approvals. With this superior knowledge, these financial institutions were expected to educate themselves on the PPP Loan process so they could in turn educate applicants. Essentially, Bank of America was expected to be an "expert" on the PPP with superior factual knowledge of the program's rules, especially compared to Plaintiffs and Class Members.

120. In this role, Bank of America represented to applicants that it would be reviewing their loan documentation in order to confirm and verify eligibility for a PPP Loan, as well as the qualifying loan amount. Bank of America knew, or should have known, that Plaintiffs and Class Members were relying on its superior knowledge, experience, and judgment, and was under a duty to exercise reasonable care to disclose to Plaintiffs and Class Members accurate information about the PPP, including what was needed to qualify for a PPP Loan and related forgiveness. Given Bank of America's position in approving these loans, Plaintiffs and Class Members had no reasonable basis to distrust the information Bank of America provided to them.

121. Yet, Bank of America failed to hold up its end of this bargain. Instead of accurately disclosing to Plaintiffs and Class Members the actual terms of the program and reviewing applications to ensure loan requests were made pursuant to SBA's rules and formula which guaranteed forgiveness, Bank of America encouraged applicants to

apply for loan amounts that were much higher than what was permitted under the PPP's terms in reliance on their representations. Specifically, Bank of America represented to Plaintiffs and Class Members that: 1) payroll expenses for 1099 workers were not only relevant for program eligibility, but were also "qualifying payroll costs" that should be added when determining the total forgivable loan amount; 2) PPP Loans would be forgiven as long as the funds were used pursuant to the terms of the Promissory Note; 3) it would be reviewing Plaintiffs' and Class Members' applications to confirm eligibility and proper loan amounts; 4) it had its own formula for determining loan amounts, and using Bank of America's formula would still entitle applicants to loan forgiveness, even if the amount was higher than permitted under the SBA's formula; 5) there was no downside to taking a loan for a higher amount because, under the PPP, forgiveness was available; and/or 6) the additional funds Bank of America said applicants qualified for had to be taken in order for Bank of America to process the loan application. None of these representations was true.

122.    These misrepresented, concealed, and/or suppressed facts were material because a reasonable consumer would have expected, based on Bank of America's guarantees in its solicitations, Promissory Notes, and communications, that the PPP Loans awarded were forgivable if all other requirements for forgiveness were met. This was a material representation that Plaintiffs and Class Members would rely on when deciding whether to enter into the Promissory Note.

123.    Bank of America knew that Plaintiffs and Class Members would rely on its misrepresentations and statements, which, if untrue, would cause Plaintiffs and Class Members loss or injury all the while increasing Bank of America's profits from fees earned off the higher loan amounts;

124.    Each Plaintiff and Class Member justifiably relied on Bank of America's representations that it would be reviewing applications and confirming loan amounts. Plaintiffs and Class Members also understood that Bank of America was in a superior position to know and apply the terms of the PPP given its position in soliciting, reviewing,

and approving PPP Loan applications. Plaintiffs' and Class Members relied on Bank of America's purported knowledge when deciding to enter into the Promissory Notes.

125. But for Bank of America's misrepresentations, Plaintiffs and Class Members would not have: 1) included payroll expenses attributable to 1099 workers in their calculation of average monthly payroll costs; 2) applied for and taken any Loan and/or would have reduced the amount of the Loan they applied for; 3) would have allocated their Loan funds differently; and/or 4) signed the Promissory Note for the full amount of the loan Bank of America suggested.

126. As a direct and proximate result of Bank of America's failure to disclose and the misrepresentations, and Plaintiffs' and Class Members' justifiable reliance thereon, Plaintiffs and Class Members have suffered damages.

**FOURTH CAUSE OF ACTION**

**Fraudulent Misrepresentation**

**(On Behalf of All Classes)**

127. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth herein.

128. Bank of America knew, or should have known, that its representations to Plaintiffs were inaccurate. Specifically, Bank of America represented to Plaintiffs and Class Members that: 1) payroll expenses for 1099 workers were not only relevant for program eligibility, but were also "qualifying payroll costs" that should be added when determining the total forgivable loan amount; 2) PPP Loans would be forgiven as long as the funds were used pursuant to the terms of the Promissory Note; 3) it would be reviewing Plaintiffs' and Class Members' applications to confirm eligibility and proper loan amounts; 4) it had its own formula for determining loan amounts, and using Bank of America's formula would still entitle applicants to loan forgiveness, even if the amount was higher than permitted under the SBA's formula; 5) there was no downside to taking a loan for a higher amount because, under the PPP, forgiveness was available; and 6) the additional funds Bank of America said applicants qualified for had to be taken in order

for Bank of America to process the loan application.  None of these representations was true.

129.   These misrepresented, concealed, and/or suppressed facts were material because a reasonable consumer would have expected, based on Bank of America's guarantees in its solicitations, Promissory Notes, and communications, that the PPP Loans awarded would be forgiven under the circumstances they were applying for loans. Bank of America's representations were a material and vital step upon which Plaintiffs and Class Members relied when they decided to enter into their transactions with Bank of America.

130.   Bank of America knew that Plaintiffs and Class Members would rely on its misrepresentations and statements, which, if untrue, would cause Plaintiffs and Class Members loss or injury all the while increasing Bank of America's profits from fees earned off the higher loan amounts;

131.   Each Plaintiff and Class Member justifiably relied on Bank of America's representations because of its representations that it would be reviewing applications and confirming loan amounts. Plaintiffs and Class Members also understood that Bank of America was in a superior position to know and apply the terms of the PPP given its position in soliciting, reviewing, and approving PPP Loan applications. Plaintiffs' and Class Members relied on Bank of America's purported knowledge when deciding to enter into the Promissory Notes.

132.   But for Bank of America's misrepresentations, Plaintiffs and Class Members would not have: 1) included payroll expenses attributable to 1099 workers in their calculation of average monthly payroll costs; 2) applied for and taken any Loan and/or would have reduced the amount of the Loan they applied for; 3) would have allocated their Loan funds differently; and/or 4) signed the Promissory Note for the full amount of the loan Bank of America suggested.

133.   As a direct and proximate result of Bank of America's failure to disclose and the misrepresentations, and Plaintiffs' and Class Members' justifiable reliance thereon,

Plaintiffs and Class Members have suffered damages.

## FIFTH CAUSE OF ACTION

### Fraud in the Inducement

### (On Behalf of All Classes)

134.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth herein.

135.   Bank of America knew, or should have known, that its representations to Plaintiffs were inaccurate, and/or that it was not disclosing materials facts in its disclosures.  Specifically, Bank of America represented to Plaintiffs and Class Members that: 1) payroll expenses for 1099 workers were not only relevant for program eligibility, but were also "qualifying payroll costs" that should be added when determining the total forgivable loan amount; 2) PPP Loans would be forgiven as long as the funds were used pursuant to the terms of the Promissory Note; 3) it would be reviewing Plaintiffs' and Class Members' applications to confirm eligibility and proper loan amounts; 4) it had its own formula for determining loan amounts, and using Bank of America's formula would still entitle applicants to loan forgiveness, even if the amount was higher than permitted under the SBA's formula; 5) there was no downside to taking a loan for a higher amount because, under the PPP, forgiveness was available; and 6) the additional funds Bank of America said applicants qualified for had to be taken in order for Bank of America to process the loan application.  None of these representations was true.

136.   These misrepresented, concealed, and/or suppressed facts were material because a reasonable consumer would have expected, based on Bank of America's guarantees in its solicitations, Promissory Notes, and communications, that the PPP Loans awarded would be forgiven under the circumstances they were applying for loans. Bank of America's representations were a material and vital step upon which Plaintiffs and Class Members relied when they decided to enter into their loan agreements with Bank of America.

137.   Bank of America knew that Plaintiffs and Class Members would rely on its misrepresentations and statements, which, if untrue, would cause Plaintiffs and Class Members loss or injury all the while increasing Bank of America's profits from fees earned off the higher loan amounts.

138.   Each Plaintiff and Class Member justifiably relied on Bank of America's representations that it would be reviewing applications and confirming loan amounts. Plaintiffs and Class Members also understood that Bank of America was in a superior position to know and apply the terms of the PPP given its position in soliciting, reviewing, and approving PPP Loan applications. Plaintiffs' and Class Members relied on Bank of America's purported knowledge when deciding to enter into the Promissory Notes.

139.   But for Bank of America's misrepresentations, Plaintiffs and Class Members would not have: 1) included payroll expenses attributable to 1099 workers in their calculation of average monthly payroll costs; 2) applied for and taken any Loan and/or would have reduced the amount of the Loan they applied for; 3) would have allocated their Loan funds differently; and/or 4) entered into the transactions on the terms forced upon them by Bank of America.

140.   As a direct and proximate result of Bank of America's failure to disclose and the misrepresentations, and Plaintiffs' and Class Members' justifiable reliance thereon, Plaintiffs and Class Members have suffered damages.

## SIXTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (On Behalf of All Classes)

141.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth herein.

142.   With regard to the PPP Loans alleged, Bank of America took on a fiduciary duty of care because it knowingly undertook to act on behalf and for the benefit of Plaintiffs. Bank of America also took on a fiduciary duty of care because it entered into a relationship "which imposed that undertaking as a matter of law." The law placed Bank

of America between Plaintiffs and the SBA, requiring Bank of America to be in a position of superior knowledge and facilitate the loan forgiveness process on Plaintiffs' behalf. Because of these assumed fiduciary duties, Bank of America owed a duty of care to the principal to make accurate representations to Plaintiffs about the loan forgiveness process.

143.   By acting for the purpose of increasing its own origination fees over Plaintiffs' ability to obtain loan forgiveness, Bank of America breached its fiduciary duties to Plaintiffs.

144.   Plaintiffs cannot obtain loan forgiveness because they relied on Bank of America's misrepresentations regarding loan forgiveness, in particular, Bank of America's misrepresentations about the loan amounts and types that would be eligible for loan forgiveness. Plaintiffs reasonably relied on Bank of America's representations to apply for, and accept, loans for which forgiveness was unavailable despite Bank of America's promises to the contrary.

145.   Plaintiffs have suffered damages in the amount of the loans for which they are now not able to obtain forgiveness, as well as all interest and related costs of the loan Plaintiffs must now bear because of Bank of America's breaches of duty.  Plaintiffs would not have incurred these damages had Bank of America put Plaintiffs' interests in loan forgiveness over its own interests in increasing its origination fees.

## SEVENTH CAUSE OF ACTION

### Violation of California Unfair Competition Act, §§ 17200, *et seq.*

### (On behalf of All Classes)

146.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

147.   Bank of America's conduct has violated California's Unfair Competition Law (the "UCL"), codified at Business and Professions Code section 17200, *et seq*. The UCL prohibits, and provides civil remedies for, unlawful and unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in

commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to serve as the basis of an independently actionable unfair competition claim, and sweeps within its scope acts and practices not specifically proscribed by any other law.

148.   The UCL expressly provides for injunctive relief, and contains provisions denoting its public purpose. Although the private litigant controls the litigation of an unfair competition claim, he or she is not entitled to recover compensatory damages for his or her own benefit, but only disgorgement of profits made by the defendant through unfair or deceptive practices in violation of the statutory scheme, or restitution to victims of the unfair competition.

149.   As further alleged herein, Bank of America's conduct violates the UCL's "unfair" prong insofar as Defendant represented to Plaintiffs and Class Members that they qualified for certain loan amounts that would be forgiven under the PPP, when it knew or should have known that it was approving applications for funding in excess of the amount allowed under the PPP, or approving applications for loans that never should have qualified to begin with. Defendant's conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiffs and Class Members arising from Defendant's unfair practices outweighs the utility, if any, of those practices.

150.   Defendant's unfair business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members.   Defendant's conduct was substantially injurious to consumers in that they are being forced to pay back principal and interest on loan amounts that never would have been originated but for Bank of America's unfair practices.

151.   Bank of America's conduct also violates the UCL's "unlawful" prong, insofar as Bank of America has violated the California False Advertising Act, Business & Professions Code § 17500. Section 17500 prohibits anyone from making a statement about goods or services that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Bank of America induced Plaintiffs to accept loans on terms that Plaintiffs would not have accepted had they known the truth. Unbeknownst to Plaintiffs, Bank of America imposed upon them (and others) loans that could not be forgiven pursuant to PPP rules. Bank of America therefore enriched itself at Plaintiffs' expense in at least two ways: (1) by collecting origination fees on loans that Bank of America either knew or should have known would not be forgiven and (2) by charging and collecting interest on the loan amounts Plaintiffs never would have accepted had they known the loans could not be forgiven.

152.   Bank of America's conduct also violates the UCL's "fraudulent" prong, insofar as Bank of America misrepresented the nature of the PPP's loan forgiveness policies in order to induce Plaintiffs (and others) to accept loans that they otherwise would not have accepted, and which they only accepted in direct reliance on such misrepresentations. In doing so, Bank of America made representations that would have been misleading to the reasonable consumer of such loans.

153.   As a result of Bank of America's UCL violations, Plaintiffs and Class Members have paid, and/or will pay, principal and interest on loan amounts that Bank of America promised would be forgiven, and thereby have suffered actual loss of money and may similarly suffer in the future if the actions are allowed to continue. Furthermore, absent injunctive relief forcing Defendant to disgorge itself of its ill-gotten gains, Plaintiffs and Class Members will continue to suffer from and be exposed to Defendant's conduct violative of the UCL.

## **EIGHTH CAUSE OF ACTION**

### **Violation of California False Advertising Act, §§ 17500, *et seq.***

### **(On Behalf of All Classes)**

154.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

155.   Defendant has violated the California False Advertising Act, §§ 17500, *et seq.*

156.   Section 17500 prohibits anyone from making a statement about goods or services that is "untrue or misleading, and which if known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

157.   Bank of America, through verbal and written communications and solicitations, misled Plaintiffs and Class Members to accept loans on terms that Plaintiffs would not have accepted had they known the truth.

158.   Unbeknownst to Plaintiffs, Bank of America imposed upon them (and others) loans that could not be forgiven pursuant to PPP rules. Bank of America therefore enriched itself at Plaintiffs' expense in at least two ways: (1) by collecting origination fees on loans that Bank of America either knew or should have known would not be forgiven and (2) by charging and collecting interest on the loan amounts Plaintiffs never would have accepted had they known the loans could not be forgiven.

159.   In making such representations about loan eligibility and forgiveness, Bank of America made representations that would have been misleading to the reasonable consumer of such loans.

160.   As a result of Bank of America's false advertising pertaining to, *inter alia*, loan amounts and types that would be eligible for loan forgiveness, Plaintiffs and Class Members have paid, and/or will pay, principal and interest on loan amounts that Bank of America promised would be forgiven, and thereby have suffered actual loss of money and may similarly suffer in the future if the actions are allowed to continue. Furthermore,

absent injunctive relief forcing Defendant to disgorge itself of its ill-gotten gains, Plaintiffs and Class Members will continue to suffer from and be exposed to Defendant's conduct.

## **PRAYER**

WHEREFORE, PLAINTIFFS and CLASS MEMBERS pray for judgment as follows:

161. For an order certifying this action as a class action;

162. For compensatory damages on all applicable claims and in an amount to be proven at trial;

163. For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

164. For an order enjoining the wrongful conduct alleged herein;

165. For costs;

166. For pre-judgment and post-judgment interest as provided by law;

167. For attorneys' fees under the California Civil Code § 1021.5, the common fund doctrine, and all other applicable law;

168. For such other relief as the Court deems just and proper.

Dated: February 22, 2023                         MCCUNE LAW GROUP, APC

_/s/ Richard D. McCune_
Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
Steven A. Haskins, State Bar. No. 238865
sah@mccunewright.com
Valerie L. Savran, State Bar No. 334190
vls@mccunewright.com
**MCCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:   (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025

Telephone:  (618) 307-6116
Facsimile:   (618) 307-6161

Hassan A. Zavareei (State Bar No. 181547)
hzavareei@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, Suite 1010
Washington, DC 20006
Telephone:  (202) 973-0900
Facsimile:   (202) 973-0950

Cristina M. Pierson, FL Bar No. 984345*
cmp@kulaw.com
**KELLEY UUSTAL, PLC**
500 N. Federal Hwy., Suite 200
Fort Lauderdale, FL 33301
Telephone:  (954) 522-6601
Facsimile:   (954) 522-6608

Attorneys for Plaintiffs
and the Putative Class

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs and the Putative Class demand a trial by jury on all issues so triable.

Dated: February 22, 2023

<u>/s/ Richard D. McCune</u>
Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
Steven A. Haskins, State Bar. No. 238865
sah@mccunewright.com
Valerie L. Savran, State Bar No. 334190
vls@mccunewright.com
**MCCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:   (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone:  (618) 307-6116
Facsimile:   (618) 307-6161

Class Action Complaint
Case No.:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hassan A. Zavareei (State Bar No. 181547)
hzavareei@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, Suite 1010
Washington, DC 20006
Telephone:   (202) 973-0900
Facsimile:   (202) 973-0950

Cristina M. Pierson, FL Bar No. 984345*
cmp@kulaw.com
**KELLEY UUSTAL, PLC**
500 N. Federal Hwy., Suite 200
Fort Lauderdale, FL 33301
Telephone:   (954) 522-6601
Facsimile:   (954) 522-6608

Attorneys for Plaintiffs
and the Putative Class

*_Pro Hac Vice_ applications to be submitted

Class Action Complaint
Case No.: